Hear ye, hear ye, this Honorable Appellate Court for the 2nd Judicial District is now open. The Honorable Susan F. Hutchinson, please be seated. Please be seated. Your Honor, the first case on the docket this morning is 2-25-0080, for the Illinois Fraternal Order of Police Labor Council, defendant Appellee. Our hearing will be on behalf of the two colleagues, Mr. Paul A. Denham. Our hearing will be on behalf of the Appellee, Ms. Mara L. Cummings. All right, good morning, Council and those present. I apologize that we are starting late. It's my fault to not blame my two colleagues. They were waiting, too. All right, Mr. Denham, if you're ready, you may proceed. May it please the Court. Again, my name is Paul Denham, and I represent the appellant petitioner, Village of Hampshire, in this case. The matter before you concerns the Village's motion to vacate arbitration award, in which, as a remedy, a labor arbitrator reinstated a patrol officer who is giglio-impaired. The Village is asking that this court apply established appellate court precedent related to City of Country Club Hills v. Charles. In that decision in 2020, the First District Court of Appeals recognized that Illinois public policy requires police officers to be absolutely honest in that respect. How many investigations had preceded this particular situation? I mean, not the situation the situation is before, but this investigation, I guess. Are you talking about in terms of a background check or? Wherever this had come up, how many investigations had there been? In terms of what happened as a prior employer where this happened, we don't know. We have very little information about what happened in 2014, other than the fact that in this particular matter, the grievance had some traffic reports that he ended up changing the disposition of those records. What was the change? We don't know. We don't know if it was a speeding ticket, a stoplight violation, following too closely. It could be anything. We know it's a traffic violation. We know that he changed the disposition of it. We know that there was discipline imposed, which ultimately is final. And we know that the findings of that investigation, on their face, he violated rules and regulations with that police department related to integrity and truthfulness. And based on. And progressive discipline wasn't imposed. Again, we don't really know how much, but. You cite the city of, or the country called Hills versus Charles. But in that opinion, the court also said, there is no absolute rule that any instance of police dishonesty must result in termination of service. I'm not advocating that each case is different. I believe that each case is different. But in this particular case, this case isn't different to those circumstances. In that case, you had an officer who was found to have been dishonest, who, to the extent that he would continue as a police officer, would not be able to credibly testify in court. The word Giglio or Brady isn't included in that opinion. It talks about the dishonesty. Here we also have a situation involving dishonesty. If there's ever a situation in Kane County where this officer is called to testify, that documentation has to be turned over. And that documentation is pretty damning with respect to his ability to testify credibly in court. That's why we have the circuit court judge who made that comment, even though he denied the city, the village's motion. Is that part of the record? It is. Once the judge enters his order, how is that part of the record? Well, it's part of the bystander's report. It's what he said in court while he was deliberating. Let's assume he made a factual finding that the cop, the grievant, I should say, is a liar. Is that something he can do as a trial court on review of an arbitration hearing? Well, let's back up a second. I think the answer is no. Well, I think under Country Club Hills, though. And while we're backing up, you know, I'm not sure at all, and I'm glad you admit it, no one is, like what is this alleged dishonesty? He changed the disposition of a attorney. I can read the record, counsel. I had a question that I was going to for you. I apologize. Excuse me. I do appreciate you anticipating my question. I would prefer to ask it myself. I apologize. The documentation, the order of suspension from 2014, it doesn't say, but it says you altered the disposition of a traffic stop. So it doesn't say traffic ticket. Then the next sentence says your actions in this incident were a direct violation of standard operating procedures. And then attached to the order of suspension, you know, that's what they call it, is a reference to warning tickets. The standard operating procedures related to warning tickets. Written warning notice will be placed in a manila. Stickers will be placed on the manila copy of the ticket that's referred to. And I think just by the look of it, and I really can't tell, they're deleting. It's Roman 1, Cap A, and then it goes 3 and 4. And this appendix, in my reading, left out 1 and 2. So what does that mean? I'm not asking you. I'm saying the record doesn't make it clear. Stickers will be placed on the back copy of a warning ticket if traffic stop data sheet will be completed where a verbal warning is given and no citation issued. So could it? Is it possible? Let me put it this way, because I don't want you to answer. Since you've already said you don't know either. To my mind, it could be something like he added a sticker to the manila copy after the day, after it was filed. Or he did the traffic stop data sheet after the written warning was issued. Or it could have been he took a bribe. There's absolutely no way to tell from this record. And so if my concern with your argument is that given there's nothing in the record as far as what this grievance did, how do we do the fact-dependent analysis that is necessary when we go to the second step of the public policy exception, upon which the burden is placed on your side? Now you can answer. Thank you. Well, first of all, the first prong of that two-part test is to determine whether there's actually a public policy that exists. And that public policy is that officers have to be absolutely honest. And if they're not absolutely honest, that can affect, for the rest of their career, even if they get a new job, their credibility in court. The second part of that is whether reinstating this officer would violate that well-defined public policy. A necessarily fact-dependent determination according to my reading of the cases, just so you know. I think we have more than enough information, even though it's limited, based on the record, to show that he was not absolutely honest. We have a finding of a police department that he violated standards related to honesty and integrity. We also have findings based on him changing the disposition of a traffic ticket, which easily will allow a defense attorney to question his credibility with respect to testifying in court. I mean, if he makes an arrest moving forward, and this is an arrest that might actually be appealed to this court, how can a jury find this witness to be credible when he's altered documents in the past? They're not giving him the benefit of the doubt, or they didn't give him the benefit of the doubt in Wheeling. They said that he violated policies related to dishonesty and integrity. They said whatever he did, and we don't have the specifics about specifically what he did with altering the disposition of a traffic ticket. They made a finding with whatever he did, he violated policies related to honesty and integrity, and I think that's more than enough for us to- No matter what the circumstances. I mean, I guess I'm concerned that that would not faithfully honor the laws stated in AFSCME. That's the Supreme Court case with the DCFS worker that made up- Yes. The report, and, you know, the court says, although raw recitation of the exceptions to prompt tests, a public policy exception, can easily be made, the exceptions' ultimate applicability is necessarily fact-dependent. And to be honest with you, while you've accused them of conflating the two-part test into one step, it almost sounds like you're deleting that second step. Just look at the public policy and then apply it no matter what the facts are, because here, for reasons, you know, that exist, there aren't any facts. Well, I think you're suggesting something that actually isn't necessarily being argued by the union here. is that, or ask you to address, is that given that the arbitrator said that Jillio impairment was not a bar, and not an impediment to his full participation of his duties, isn't that a fact we have to accept? We can't look behind, really. I mean, we can't look behind the ruling. All we can really do here is look at the public policy exception and see if you as the appellant have fleshed it out sufficiently. So the fact that the arbitrator did find was that this officer was Jillio impaired. I think your questioning before that seemed to poke holes at that finding, seemed to suggest that there might be a possibility that we know so little about his work. I'm not poking holes in his finding. We know so little. I'm just saying the public policy exception requires these two things, and I'm not sure how you as the appellant or as a proponent of the public policy exception are going to be able to meet it given this record. If you're suggesting that there might be a situation in which this vague misconduct from the past does not require a situation where this officer is Jillio impaired, that is actually something I think the village could live with. If it's a situation in which this officer isn't tainted by these facts from the past, this isn't Jillio information that's going to destroy the officer's credibility in court, I think my client could probably live with that. The problem we have, though, is first of all, the arbitrator said it was a situation where this officer was Jillio impaired. There's never been a finding that this incident from 2014 doesn't stay with him to 2025 in terms of the situation. Your question about whether the finding about Jillio impaired sticks with your determination, I don't think that's the case. I think as was stated in the county of DeWitt case, questions about whether the opinion draws its essence to the contract, whether there's just cause, that's a question for the arbitrator. Your determination is about whether it violates public policy, and we're not challenging whether there was not just cause in this particular situation. The arbitrator made his factual findings. He made his determination under a just cause standard. The fact that he thought that a Jillio impaired officer could be placed on something like a we-do-not-want-to-call list, which I don't even think exists, that's fine. We're not challenging that. All we're challenging is the fact that the arbitrator did say he's Jillio impaired. The arbitrator did concede that based on these issues related to untruthfulness in the past, he is going to have credibility issues for the rest of his career. Let me ask you this question. Were you a prosecutor? I was not. You were not. Occasionally, police officers will testify in a case, and then that case has to be retried, and the officer provides inconsistent testimony with his first testimony from the first trial. Is that grounds to discipline that officer? Would that be grounds to discipline that officer because he recalled something different and he testified differently than he did at the first trial? Is that something that you would have to disclose to the prosecutor? No. Inconsistent testimony? No. I mean, if he lied on the stand, and there's an internal investigation, and there's ultimately a finding based on that internal investigation, which isn't arbitrated, which isn't grieved, and if it is arbitrated and grieved as final, you did lie on the stand, then that's a final disposition from an administrative process in which the arbitrator was dishonest. But in this case, the officer accepted the discipline that was originally imposed, correct? That's what the record says. And a well-accepted principle, which Justice Cunningham noted in her dissent in Country Club Hill's case, saying that when the parties agree to arbitration to resolve conflicts, the arbitrator's decision is given great weight unless it can be shown that there was fraud, bias, or misconduct by the arbitrator. Yes. Do you agree with that principle? I do. Was there fraud or misconduct by the arbitrator? Not according to the record. Then how do we reverse this case? I don't think internally, you're talking about reversing the case in terms of the motion to vacate? Yeah. Again, this is a public policy situation. There's no public policy. There's no hard and fast public policy. And the majority in Country Club Hill said as much. There's no absolute rule that any instance of police dishonesty must result in termination of service. But it did say that police officers have to be absolutely honest. That's called dicta. That was not the holding in the case. Well, they also went forward and said that the reason why officers have to be honest is because any sort of finding of dishonesty ruins their credibility for the rest of their careers. And the reason why in Country Club Hills that officer who was dishonest during an interrogation and was found to be dishonest during interrogation, the reason why that officer couldn't be reinstated was the same issue that's before you today. There's a finding of dishonesty. In that case, we knew or the court knew the underlying facts. Here, we don't know what the underlying facts are. I mean, that opinion is very vague with respect to what actually the dishonest conduct was. That dishonest conduct wasn't an issue before that court just as it's not here today. But there were multiple examples in that case as well. I mean, if you want to go back to this particular arbitration, the officer didn't testify on his own behalf. I think at some point the union did raise some of the same arguments about how, well, this really doesn't stick with him for a decade later and that sort of thing. That wasn't decided by this particular arbitrator, and it wasn't really arbitrated to the point that it was an issue. In this particular situation, there's a finding of fact that this particular officer was disciplined for two days for dishonesty and integrity issues. There's clear evidence that two different states' attorneys have come to the understanding that based on that situation, this officer can no longer testify in court. Excuse me for interrupting on that, but it reminds me that in the record, they have the Cook list, and he's not on it. Yes. Of what significance is that? I don't think much. I mean, there's many things that can explain that, one being he actually resigned. You know, again, he was put on paid administrative leave. He resigned from Wheeling, but he continued to work as a cop elsewhere. Excuse me. He wasn't prohibited from working anyplace else other than Wheeling, correct? Well, he resigned, so I think the way the timeline goes is initially there was this discipline. You know, there's nothing in the record as to how Cook composes their list. I saw they didn't just have Cook. They had other officers outside Cook, at least as far as I recollect. It wasn't strictly limited to Cook officers as far as I can see. But, I mean, my point, I think, is that it doesn't appear that there ever was a final decision with Cook County. Well, they said they weren't going to prosecute him. According to the documentation, the Wheeling Police Department said it was going to place him on paid administrative leave so it could look into that issue about the Cook County state's attorney saying that it might not call him. And instead of going through that process to make a final decision about whether he should be terminated or disciplined from Wheeling about his inability to credibly testify in court, he went ahead and resigned. So I think there is something that explains the fact that he's not on this list. I mean, at the end of the day, he wasn't working for Wheeling anymore. But there's no agreement that he wouldn't be prosecuted. He could have been prosecuted even though he resigned. Cook County did not prosecute him for any criminal offense. Again, Country Club Hills is not a Giglio or Brady case. It's a case about dishonesty and the ability to credibly testify. And the dishonesty could have been limited to, as Justice Mullen pointed out, picking up that folder after it had been in whatever custody it belonged in in Wheeling and putting a sticker on it because that's one of the possibilities. It is only one of the possibilities. I mean, there is evidence in the record that he did purposefully change a traffic stop warning or no warning to warning, I believe is the word. A verbal warning to a written warning. Yeah. Which could have been identified via this sticker, correct? Yes, but he actually went back and changed it. So he actually did put the sticker on and then changed it. Does that mean he is dishonest? According to their findings, yes. And if he said, I'm not dishonest, it was a mistake, I wasn't purposefully doing that, he had an option back then to grieve and arbitrate that process and to arbitrate it to the point where they would find a different conclusion. Instead, it appears that he went from negotiating a four-day suspension to a two-day suspension, which is what the record says. All right. Do I have any other questions, Justice Burkett? Just briefly, did you want to address at all the Illinois Law Enforcement Training and Standards Board that discretionary decertification of full-time and part-time law enforcement officers who've made a false statement? They're subject to progressive discipline. Yeah. I think that's in line with the public policy that I'm asking you to enforce here. There have been changes to the law, including with respect to background checks, with respect to decertification, with respect to actually personnel records. Keep in mind, one of the reasons why we don't have personnel records here is because there have now been changes to the law, which allowed Wheeling to shred some of these prior records, which we don't have the ability to obtain anymore. So, yes, the public policy has gone from allowing these sorts of situations to percolate, where an officer who has to resign based on Big Leo issues can catch on with another municipality, to the point where now, under state law, there's a chance that that officer can be decertified. There's a chance that the law just recently has been strengthened to require law enforcement agencies to obtain these sorts of background records so it can make more of an informed decision than the village did in this particular situation. All right. Counsel, you will have an opportunity to make, reply, or rebuttal. If you choose to do so, your time has ended versus the timer. Okay. Thank you. Good morning. Good morning. Please, the Court. What I heard Mr. Benham say a few minutes ago, which I think is really important, he said the case that he primarily relies on, Country Club Hills, did not involve someone being terminated for being Brady-impaired. It involved dishonesty, and that is the crucial difference. And I think, Justice Mullen, your questions allude to that. Let's assume for a minute that Country Club Hills' case stands for the propositions that public policy prohibits a law enforcement officer who is found to be dishonest from being employed with exceptions. I agree with you, Justice Burkett. It says depending on the facts and circumstances. But dishonesty was not in front of the arbitrator. To this day, I don't know any more than you know about the prior issue of dishonesty. He was not fired for dishonesty. He was terminated because the only allegation by the Department was he could no longer fulfill his functions of a law enforcement officer, which that function would be to be able to cooperate essentially and testify in a criminal defense case. And it looks like Hampshire made its basic decision on the State's Attorney of Cook or, I'm sorry, King County's position.  And that's what was presented to the arbitrator. Correct. And you asked a question earlier about prior investigations, and maybe I misunderstood you, but I think it's important to note that Hampshire was well aware of all this information when they hired him. He was completely transparent. And he was hired in 2021. This was before he was even hired. He was fully vetted, fully transparent. Then there were two more investigations in 2022 based on anonymous Facebook posts, anonymous letter, presumably sent by the same person. And, again, the Department said, we don't have a problem with this. We've reviewed his background two more times, and we're going to keep him here. In fact, we're going to give him specialty positions. The only thing that changed was that letter from the State's Attorney. But as the arbitrator said, they were fully aware when they hired him that he was potentially brain impaired. Can I?  From my point of view, I hear you sort of obliquely, and I don't mean that in a pejorative sense, arguing that, well, so there wasn't just cause. Correct. But just as, you know, I took issue with counsel on that point. He thinks there is. Right. I don't think that's the issue here. I don't think we can decide. I think that's beyond the reach. Parties have contracted to have an arbitrator decide the facts and to interpret the contract.  The only thing before us is, is there an exception for public policy? Correct. A two-step determination. Correct. So I would argue the public policy issue here is whether or not public policy prohibits a brain impaired officer from being employed, and there's absolutely no case that says that. He didn't cite any because there isn't any. There are, I submit, I've been doing this 30 years, there are brain impaired officers testifying across the state of Illinois successfully. Being brain impaired could be as much as making a mistake on your traffic report to, you know, perjury. Obviously those two cases are different. And to say just because you're brain impaired should absolutely ban you from being a law enforcement officer is draconian. And there's a distinction that was made by the arbitrator, and he didn't just make this up. He cited prior cases. The difference between cannot testify and would prefer not to testify. And in simple terms, if you've been barred from ever testifying again, well then, yes, in those circumstances, you cannot perform your job function. If you're giggling impaired, that means you can testify. The information, I don't want to get through the whole brain process. I'm sure you're familiar. The information may or may not be ordered to be turned over. It may or may not be determined to be relevant. And if it is, it's impeachment. It's impeachment material. Witnesses, including officers, are impeached every day. That doesn't mean you should be banned from ever being a law enforcement officer again. Brady, obviously, and his progeny, since it's come up several times, since the 1960s, it's defined and refined prosecutor's disclosure requirements. And that's really what that's about. It's intended to make sure criminal defendants' rights are protected. It's not meant to be a hammer to automatically terminate an officer who may be giggling impaired. And to your earlier question, you know, if an officer's testimony is inconsistent, it will just depend. I mean, if he was careless enough not to review his prior report and it was a memory issue, that's different. If he lied on oath and, for example, his body camera shows he was completely falsifying his testimony, that's different. But that's not what's before you. Right now, and that's going to depend, this information that you found, whether or not the state's attorney will or will not use it or will not use it remains to be seen. But what they're arguing is that public policy should absolutely bar this man from ever being a law enforcement officer again. And that's simply not what the cases say. And I'll still have here. And I think back to the Country Come Hills case, which I think does give, doesn't say it is an absolute bar to officers who have been dishonest or breathing impaired, however you want to phrase it. But let's say dishonest because that's how it's been argued by the village. There are exceptions and circumstances. And the arbitrator looked at those circumstances. Without finding him dishonest, right, that wasn't the issue before him. You know, there was prior knowledge by the village, as I indicated earlier. They knew about this when they hired him. They investigated his background two more times and did nothing. Still put him in positions of specialty. He was never disciplined there at Hampshire. He was never a founder of Blyde at Hampshire. The only difference is that letter. And that letter simply says we may or may not use this officer because of his Brady impairment. But that should not be an absolute ban to him losing, you know, ever being a law enforcement officer again. That's just not what the intention of Brady was, and it's not the intention of the public policy. Is there anything in the record that reflects how the state's attorney of Kane County became aware of this? Yes. What's in the record? My recollection is that the chief, when he was doing, I think, another investigation, probably the second one after the letter came up or the Facebook came up, I don't remember when, but he was trying to determine, confirm whether or not he was actually heeding the officer who was on the Cook County state's attorney's do not, I mean, Brady list. That was never confirmed. And, in fact, as Justice Linden pointed out, the actual list that was put into evidence was not even on it. In the process of that, he contacted the Kane County state's attorney asking for guidance on how to approach Cook County because, shockingly, they weren't promptly responding, and also asked him during the course of those discussions, well, what is your opinion about whether or not there's a Brady issue here in Kane County? That's sort of the gist of how it went down. And, you know, even though the chief, and I'm not trying to suggest he intentionally, you know, was being cagey, but even though he repeatedly said in his documentation, and I don't even understand, they will not use him, they will not use him, they will not use him, that simply wasn't the case. As the state's attorney testified, we would prefer not to, it makes it harder, we have to turn it over, and her actual letter doesn't say that either. So unless you have questions, I'm pretty much done with my argument. And just in summary, any basis for overturning an arbitration award, be it a statutory basis, fraud, misconduct, or this judicial basis which is sort of developed through the court's public policy, is very narrow, very limited. To be successful, the village has to show a well-defined and dominant public policy from the case law and legal precedent and a violation, and it simply has not happened here. So in light of their failure to satisfy that heavy burden, in light of the circumstances of this case, we would respectfully ask that you affirm both the circuit court and the arbitration. Did Kane County ever, Kane County State's Attorney ever actually put the officer on their Brady list? If I recall correctly, I don't think they have a written, like Kane County had, I don't know if they still have it, but I don't know if it's actually in writing. They just said he was Brady impaired. Well, the letter indicates that we determined that we will no longer want to call him to testify in any misdemeanor or felony. Correct. And it does mention Brady Julio at first, maybe in the first letter or the first sentence, but it doesn't actually say, it just says we're not going to call him. We prefer not to call him. We prefer not to call him. Right. And that could change with State's Attorneys. Absolutely. As apparently this case changed with Chiefs of Police. Exactly. It went through at least three, the Wheeling Chief and two Hampshire Chiefs. Correct. And Pan really wasn't moving until such time as he just, he didn't do it just for this case, but he decided he would look at all the personnel records and see how they had been done. Correct. And to your point, even though there's years and years and years of cases defining and refining Brady, there is still obviously an element of subjectivity to it. I mean, we look across the state and the way Cook County handles Brady is different than DuPage County and different than King County. And within the offices, individual offices, I mean, attorneys handle it differently and judges handle it differently. So to your point, her opinion, and she had the right to her opinion, is subjective. It's not as far as I know in writing other than that letter, and that could change depending, and there's other things too. It's over 10 years old. I mean, the state's attorney found a 10-year-old alleged dishonesty is not relevant. So there's a lot of factors that are going to come into play should this come up in the future. Okay. Thank you so much for your time. All right. Mr. Denham, if you wish to reply. Yes, just a few follow-up comments based on Justice Mullen's question. I wanted to clarify, the village is not challenging the just cause determination in this case. This case is a public policy case. The fact that there may have been issues related to the investigation and pre-employment and the arbitrator used that to show or to finalize, to determine that there wasn't just cause. We're not challenging those sorts of things. We're not challenging the arbitrator's rationalization related to a do-not-call list versus a do-not-want-to-call list. Those are the arbitrator's findings. It's under a just cause standard. We believe that we don't even have the ability to challenge whether those determinations are correct. Those are his factual findings. Those are true. Again, this case is very simple. It's based on the Country Club Hills Public Policy Test. Was there an issue related to this individual's truthfulness? Unambiguously, yes. Unambiguously, there's a document that was provided to him that gave him the right to challenge a finding of truthfulness. There's no indication whatsoever that this individual challenged the finding about truthfulness. I think this is an easy way to destroy the officer's credibility moving forward. If I was a defense attorney, all I would ask this guy is, isn't it true that in the past you have untruthfully modified police documents? If he says yes, that's the truth. We have those records in front of you. If he says no, well, here are the records. Weren't you suspended two days for integrity and truthfulness issues? Yes. Isn't it because you changed the disposition of a traffic stop? Well, if you actually had a chance to ask that question, the state then would have a chance to finally find out what that violation was. We might find out it was a sticker, a silver sticker that he put on the back of a ticket showing it to be or not a ticket, but a warning showing it to be from a verbal to a written warning. Well, in fairness, we did investigate him, and he did concede that he was disciplined. There's no dispute about whether he's disciplined or not. I know that, but now we know why, which is really the crux of your argument here. He could be dishonest as to putting a time on it. Instead of putting a.m., he put p.m., and he went to change it. He said in his response to Hampshire, I did what I did pursuant to my turning over information about what I did, and nobody seems to care that he made that response to Hampshire. It doesn't come up in the record of the arbitrator. Well, in fairness, he wasn't called as a witness by the union. If the union wanted to raise these facts that you're assuming or all these questions about traffic stickers and all of that, they definitely could have called him to testify, and they didn't do it. They could have, but all of the documents that he had used to respond should have been in the record, correct? Yes, we have the entire arbitration record. Well, that's what he said in response to the initial Hampshire request. I mean, I feel like here the village is actually relying upon everyone's finding. The arbitrator found that this individual was galeo-impaired. The circuit court judge said that he would have issues accepting this individual as a witness. There's no dispute whatsoever that this is good discipline with respect to him not challenging the findings of dishonesty and truthfulness. Everyone is basically in agreement that this individual has serious credibility issues. Based on those credibility issues, I asked the court whether under the Country Club Hills public policy determination, you can reinstate this individual while we know that he's going to have galeo issues for the rest of the career, while we know that there's documentation in his record about dishonest conduct. If he went to work, I think he got offered a dispatcher job, possibly, somewhere along the line. I mean, I sat in the prosecutor's office for several years before I became a judge. We called dispatchers all the time. What did you hear? What was the call about? Now, how can he be a dispatcher and be dishonest and not be a police officer and be dishonest? I don't know what his personnel file looked like on the dispatcher side of things. Well, but the fact of the matter is they offered him a dispatcher job, correct? He worked as a dispatcher, yes. Right.  The record is the record. The record is the record. But you raise the point where he could have called them and they could have asked him and then we would know. And it's sort of left-handed in implying that the burden's on him. It isn't. It's on the person raising the exception. But as long as we're talking about what could have been in the record, I suppose the chief could have used the Uniform Act concerning police discipline and required the officer to make a statement under oath and we could get to the bottom. What was it about? But we don't know. And that's where I leave it. Without seeking to blame necessarily unless there's some legal reason to analyze that. The burden definitely was on the village to show that he was a good officer, that he had truthfulness issues. It was whether or not the odd ruling as applied violates the public policy. Yes. So, again, you're looking at all these factors. What was the wrong? What was done wrong is a key thing in all these cases. What did they do? For example, there's a case where I can't remember the municipality, but the facts are sadly in my mind, where a police officer put video cameras all over his ex-wife's house, including the bedroom. And the appellate court found no public policy exception there. Not because it didn't violate public policy, it absolutely did, and not because he hadn't, excuse me, the police officer hadn't contravened it, but because in that case, and I see this as kind of a sophisticated or, I see it as a good example of how the rules actually apply, at least by some courts. And you're free to dissuade us, but let me just make my point. The court affirmed the reinstatement because in that case, even though he had done that, even though he had lied initially during the investigation, but because the arbitrator's award gave him a one-year suspension with no pay, no seniority, no pension, credit. He had a one-year suspension. And the court said that severe sanction, given even the heinous nature of what he did, did not violate the public policy. That's how I see the rule as being applied. You really have to look at the nuts and bolts of the facts of the case and the ruling and the opposite, and then I'm going to stop and let you talk. But the DCFS case, I don't think any sanction was given. And the Supreme Court was like, this is a violation of clear public policy, and the award here, as applied, did nothing, and that can't stand. So, you know, to me, they're both examples of the courts in using or applying the public policy exception, looking closely at the facts and the ruling, if that's helpful to you. Yeah, and I just wanted to follow up, because I think you mentioned, I think that case is Aurora. But I don't know if there's necessarily a dishonesty component to that case. He had lied to the officer who responded to the house after the wife found it and said he didn't do it. But I don't believe that that was actually decided on public policy dishonesty grounds. The case itself was absolutely decided on public policy grounds. Well, the reason I'll note that, though, is there was a very similar case in Decatur, which is in the materials, in which that was in a strange situation involving spouses in a domestic incident. There was a component in that case where there was a finding of dishonesty. And in that case, which was also, I believe, cited in the Country Club Hills case, the fact that there was a dishonesty component in that case actually turned it for the court in that case to overturn the arbitration award and to find that that was a violation of public policy, unless there are any other questions. But that was the cop who, the pre-sub series, had voted his wife. It's just that my point is these are fact-specific determinations. Yes. Any other questions? I believe not, Justice Malone. Thank you. Thank you, counsel, both, for your arguments here today. We will take this matter under advisement. We will be on a short recess to prepare for our next case. All rise.